**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE LEE SANDS, | ' | BANKRUPTCY NO.: 19-12715 |
| DEBTOR. | ' | CHAPTER 13 |
| | ' | SECTION "A" |

-----------------------------------------------------------------------------------------------------------------

## ORDER AND REASONS ON OBJECTION TO PROOF OF CLAIM

The Court held an evidentiary hearing on September 25, 2020, on the *Objection to Proof of Claim*, [ECF Doc. 29]; the *Amended Objection to Proof of Claim*, [ECF Doc. 34]; and the second *Amended Objection to Claim 3*, [ECF Doc. 59], each filed by the Debtor (together, the "Objection to Claim"); and the Response to the Objection to Claim filed by Jana Podret and Roger Williams on behalf of Jon Podret, [ECF Doc. 62]. Debtor objects to Proof of Claim 3 (the "Podret Claim") filed by his former landlord for property damages and unpaid rent. After considering the testimony and admitted exhibits, the record, the parties' arguments, and the applicable legal authority, the Court ALLOWS the Podret Claim as an unsecured claim in the amount of **$22,629.04**. As further specified below, the Creditor is instructed to amend the Podret Claim within sixty (60) days to list creditor "Jana Podret" as the named creditor.

### JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334 and the Order of Reference of the District Court dated April 11, 1990. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b). The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

**NOTICE**

Notice of the Podret Claim, the Objection to Claim, and the Response to the Objection to Claim was sufficient and constituted the best notice practicable.  All persons affected by this Order were afforded a full and fair opportunity to be heard prior to and during the evidentiary hearing.  Notice of the relief granted herein has been given to all persons affected by this decision and is in full compliance with due process.

**PROCEDURAL BACKGROUND**

Lee Sands ("Sands" or the "Debtor") filed for bankruptcy under chapter 13 of the Bankruptcy Code on October 5, 2019.  [ECF Doc. 1].  On November 12, 2019, and as amended February 27, 2020, Jon Podret, through his agents, filed Proof of Claim 3 for an unsecured claim in the amount of $29,363.75 for "breach of lease and damage to property."  Claim 3-2.  The original proof of claim was signed by Roger Williams ("Williams"), his son-in-law, while the amended proof of claim was signed by Jana Podret, his daughter, each designated therein as "Agent for Jon Podret."  Claim 3-1; Claim 3-2.  The Debtor filed and twice amended his Objection to Claim. [ECF Docs. 29, 34 & 59].  After the parties attempted mediation, but were unsuccessful, *see* [ECF Docs. 75 & 90], the Court held an evidentiary hearing on September 25, 2020.

Jana Podret and Williams (together, the "Podrets") appeared pro se on behalf of Jon Podret, the creditor of record.  Before any witnesses were sworn in, the Court learned from the Podrets that Jon Podret had passed away; Jana Podret later testified that he passed on December 25, 2019.  Hr'g at Min. 9:33, 12:19.  Debtor's counsel did not dispute that the Podrets had power of attorney for Jon Podret when he was living, but noted that the power of attorney ceased to be effective upon his death.  Hr'g at Min. 9:35.  The Podrets stated that they had not opened a succession because they were informed that the limited assets in Jon Podret's estate made formal probate unnecessary.

Hr'g at Min. 9:34. The Court elected to proceed with the evidentiary hearing and noted that it would address the matter of who had the legal right to bring the Podret Claim in its written opinion. Hr'g at Min. 9:37.

The Debtor testified on his own behalf, and the Podrets called Jana Podret and Heyer Hanson ("Hanson"), the contractor who performed repairs on the leased property after the Debtor moved out. Both sides also submitted exhibits. Based on its consideration of the testimony, the exhibits, and the record as a whole, the Court makes the following findings of fact.

## FINDINGS OF FACT[1]

On March 27, 2019, Sands signed a two-year lease (the "Lease") for the residential property at 3722 Jean Place, Metairie, LA, 70001 (the "House") to serve as the residence for himself, his wife, their two minor children, and their small dog (together, the "Sands Family"). Debtor Ex. 4. Though Jon Podret owned the property at the time, Sands testified that he consistently communicated with Jana Podret or Williams regarding the lease and the property rather than with Jon Podret directly. Hr'g at Min. 9:58. According to Jana Podret's testimony, the Podrets completed a full renovation of the House shortly before the Sands Family moved in, including repainting the entire interior of the House and refinishing the concrete flooring on the first level. Hr'g at Min. 11:29.

The Sands Family moved in on or shortly after April 10, 2019. *See* Debtor Ex. 4; Hr'g at Min. 11:13. Though they ultimately moved out less than a month later on May 6, 2019, *see* Podret Ex. E, at 12, Sands testified that they initially hoped to live in the house for an extended period of

---

[1] These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

time.  Hr'g at Min. 10:09.  Sands testified that his daughter, who was two years old at the time, is autistic, and therefore needs stability and other accommodations in her home environment.  Hr'g at Min. 9:41–9:46.

In preparation for their move-in, the Sands Family repainted at least five rooms and replaced the carpet in three of the upstairs bedrooms.  Hr'g at 9:55–9:58.  Sands testified that this was both to help his daughter feel more comfortable and because, based on his representations, the paint and carpet in those rooms was old and in poor condition.  *Id.*  As the Court will address in more detail below, the parties disagree on what their agreements were as to both of those projects and whether the final results complied with those agreements.

Sands also testified that he quickly became concerned about several perceived safety hazards with the House.  Though he toured the House before signing the Lease, he did not notice until his family was living there that the bars in the railing along the upstairs landing were spaced far enough apart for their small daughter to fall through.  Hr'g at Min. 10:30–10:32.  Sands sought permission from the Podrets to hire a contractor to construct a temporary wall in front of the railing.  Hr'g at Min. 9:44.  The specifications for this proposed wall were not finalized before the Sands Family moved out, in part because the Podrets had concerns that the Sands' contractor's plans were for a permanent, rather than a temporary, wall.  Hr'g at Min. 2:26.  In addition to the railing, which Sands testified was his primary safety concern, Hr'g at Min. 11:02, Sands also discovered that his daughter could access a shed full of old construction materials through the backyard.  Hr'g at Min. 9:52–9:54.  Additionally, he testified that he was concerned that the backyard fence was damaged, with a hole in it that his daughter tried to climb through to see the neighbor's dog.[2]  Hr'g

---

[2]    Sands testified that the contractor and friend who he asked to build the wall, Marc Dahlman, inspected the House and informed him that those and other conditions within the House constituted code violations and potential safety hazards.  Hr'g at Min. 9:58–9:59, 10:57–11:09.  Dahlman, however, did not testify.  Accordingly, the Court has disregarded Sands' testimony about the condition of the House as

at Min. 11:20.  On cross-examination, Sands admitted that, other than the ongoing discussions about building the wall in front of the railing, he did not inform the Podrets of any other concerns until he sent a letter to them on May 6, 2019—after he had informed them that he and his family were moving out.  Hr'g at Min. 11:16–11:21; Debtor Ex. 1.

Sands testified that he and his family decided to move out of the House on May 1, 2019, after they saw two different people who they believed were trying to break into the House through the front door.  Hr'g at Min. 9:46–9:48; Podret Ex. Q, at 18.  Though there was some confusion during the testimony about the timeline that followed, the Court determines based on the day of the alleged attempted break-ins, the witnesses' testimony, and the receipt showing when the Podrets changed the locks, that the Sands Family had moved out by the evening of Monday, May 6, 2019.  Hr'g at Min. 11:13–11:15.

Jana Podret testified and provided text messages showing that Sands contacted them the night of May 6, 2019, to inform them of water damage in the House from a leaking toilet.  Hr'g at Min. 11:44–11:46; Podret Ex. Q, at 20–21.  Sands testified more specifically that he contacted them because he noticed water leaking past the cutoff valve and collecting around the base of the toilet and that he shut off the water valve in response.  Hr'g at Min. 10:17–10:18.  Jana Podret testified that she and Willliams went to the House that night to address the leak and found that brown water had seeped from the upstairs toilet into one of the upstairs bedrooms, and then through the floor down into the ceiling and walls of the downstairs master bedroom, closet, and vanity.

Hanson, the Podrets' contractor who repaired the damage to the House including that water damage, testified that he determined from the smell and the color that the damage was caused by organic waste, not just water.  Hr'g at Min. 12:48–12:49.  He further testified that based on that

---

inadmissible hearsay to the extent he relied not on his personal observations, but on Dahlman's out-of-court representations that cannot be tested through cross-examination.  *See generally* FED. R. EVID. 802.

assessment, the large amount of water, and the fact that he could find no leak or other defect in the toilet, he believed that the damage had been caused by an overflowing toilet rather than a leak. Hr'g at Min. 12:48–12:52.

After discovering that and other damage, discussed in detail below, and finding that the House was empty of personal possession but for one bedframe, Hr'g at Min. 11:45–11:46; 11:54, the Podrets changed the locks to prevent the Debtor from re-entering the House.  In addition to Jana Podret's and Hanson's testimony, the Podrets provided numerous before-and-after photographs documenting damage the House and receipts for supplies and repairs.

## CONCLUSIONS OF LAW

### I.      Identity of the Claimant

As a threshold issue, the Court must establish who has a legal right to bring the Podret Claim after Jon Podret's death in December 2019.  Though Jon Podret granted power of attorney to the Podrets, such agreements cease to be binding after the principal passes away.  *See* LA. CIV. CODE ANN. art. 3024.  The facts before the Court, however, demonstrate that Jana Podret has a right to seek damages from the Debtor independent of her agency relationship for Jon Podret.  Jana Podret told the Court that she and Williams were in the process of buying the House from her father when the Debtor executed the Lease, and that they in fact purchased the House in the summer of 2019.  Hr'g at Min. 9:34.  Further, in the Lease itself, Jana Podret is listed as the sole "Lessor" throughout, and she signed her name without reference to acting as an agent for Jon Podret.  Podret Ex. A.  The Court finds that, as the Lessor and counterparty to the Lease and the owner of the House that is the subject of the Lease, Jana Podret is entitled to bring this claim against Sands in her personal capacity.

Currently, the Podret Claim lists the creditor as "Jon Podret." But "[a]mendments to timely creditor proofs of claim have been liberally permitted to cure a defect in the claim as originally filed" as long as the Court "ensure[s] that corrections or adjustments do not set forth wholly new grounds of liability." *United States (I.R.S.) v. Kolstad (In re Kolstad)*, 928 F.2d 171, 175 (5th Cir. 1991) (citations and internal quotation marks omitted). Amending the Podret Claim to designate Jana Podret as the creditor instead of her deceased father would not affect the nature or amount of the claim, and the Court finds that Sands, who in fact consistently dealt directly with Jana Podret and Williams from the start of the Lease, would not be otherwise prejudiced. Further, even Sands' counsel represented at the hearing that he did not want to "jam someone on a technicality . . . when that person is not an attorney." Hr'g at Min. 9:37; *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (noting that pro se filings are held to "less stringent standards" than those drafted by attorneys).

Accordingly, the Podrets are directed to AMEND the Podret Claim to change the name of the claimant from Jon Podret to Jana Podret within sixty days from the date of this Order.

## II.    Validity and Amount of the Claim

A proof of claim filed in accordance with Bankruptcy Rule 3001 is "prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f). "This prima facie validity may be rebutted by the objecting party producing evidence 'of a probative force equal to that of the creditor's proof of claim.'" *In re Cent. La. Home Healthcare, LLC*, 617 B.R. 263, 268 (Bankr. W.D. La. 2020) (quoting *Cal. State Bd. of Equalization v. Official Unsecured Creditos Comm*. (*In re Fidelity Holding Co., Ltd.*), 837 F.2d 696, 698 (5th Cir. 1988)). "Once an objecting party produces evidence rebutting a proof of claim, the burden then lies with whichever party it would normally, according to the relevant substantive law." *Id*. Here, the Podrets have claims under

Louisiana law for the Debtor's alleged damage to the House and for unpaid rent and related expenses following his abandonment of the House pursuant to the terms of the Lease.

### A.  Debtor's Liability for Property Damage

Article 2687 of the Louisiana Civil Code provides:  "The lessee is liable for damage to the thing caused by his fault or that of a person who, with his consent, is on the premises or uses the thing."  The Debtor's Lease similarly provides:  "Should there be any damage to the leased premises or equipment therein, reasonable wear and tear excepted, caused by the Lessee, his family, guest or Agents, Lessee agrees to pay Lessor when billed the full amount necessary to repair or replace the damaged premises or equipment."  Podret Ex. A, at 1.  A lessor bears the burden of demonstrating by a preponderance of the evidence that a tenant is responsible for damage to the property.  *See Guidry v. Midgett*, 488 So. 2d 1323, 1327 (La. Ct. App. 1986).

Although "[t]here is no formula that can be applied with exactitude in the assessment of property damages," the goal, as with any damage award, "is to restore the plaintiff, as closely as possible, to the position that he would have occupied had the [damage] never occurred."  *Cross Gates, Inc. v. Rouses Enters., L.L.C.*, 267 So. 3d 1164, 1170 (La. App. 2018).  Louisiana courts follow three general approaches when calculating awards for a tenant's damage to property:

> (1) the cost of restoration if the thing damaged can be adequately repaired; (2) the difference in value prior to and following the damage; or (3) the cost of replacement new, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined, or if the cost of the repairs exceeds the value of the thing damaged.

*Id.* at 1170–71 (citing *Carter v. Gulf States Util. Co.*, 454 So. 2d 817, 820 (La. App. 1984)).  The damages in question "must be proved to a reasonable certainty."  *Moreau v. Griffith*, 685 So. 2d 563, 564 (La. App. 1996).  Regardless, "[w]here there is a legal right to recovery of damages, but the amount cannot be exactly determined, the courts have reasonable discretion to assess them

based upon all the facts and circumstances of the particular case." *Cross Gates, Inc.*, 267 So. 3d at 1170.

### 1. The Sands' paint job

The Podrets' before-and-after photographs admitted as exhibits demonstrate that the Debtor repainted five rooms—the three upstairs bedrooms, the downstairs dining room, and the downstairs bathroom.  Podret Ex. P.  Jana Podret testified that they only granted the Debtor permission to paint two rooms:  the bedroom for their daughter ("Bedroom 1") and the bedroom for their son ("Bedroom 2").  Hr'g at Min. 11:32–35.  Sands testified that they were also given permission to paint the additional rooms, but could offer no record of those conversations.  Hr'g at Min. 10:53–10:55.

The parties agree that the Podrets preapproved certain paint colors, but disagree on whether those were the colors used.  *E.g.*, Hr'g at Min. 10:45.  Per Jana Podret's testimony, and as illustrated in a text message from the Debtor with a photo of the color swatch, Bedroom 1 was approved to be painted "Lily Lavender," which appears to be a light, muted lavender.  Podret Ex. Q, at 3; Hr'g at Min. 11:47.  The photographs that the Podrets took of Bedroom 1 after the Debtor left, however, show the room painted in a much brighter and darker color.  Podret Ex. P, at 10. Sands denied that the color he used was different from the one approved, admitting only that it came out darker than he expected.  Hr'g at Min. 10:43.  Though the Court does not have a sample swatch of the approved color for Bedroom 2, the photographs of that room after it was painted show that it was painted a bright blue color that Jana Podret testified was also not the approved paint color.  Podret Ex. P, at 11; Hr'g at Min. 11:51.

But even if all five rooms were indeed approved to be painted and the colors were those the Podrets agreed to—which the Court believes unlikely based on the evidence before it—the

Court concludes that the rooms now require repainting due to the poor quality of the paint job performed by Sands and his contractors.  Sands equivocated in his testimony when asked on cross-examination if he hired professionals to paint; he ultimately explained that he hired one man, whose full name he could not remember, that that man brought in an assistant part-way through the job, and that he, Sands, also assisted personally with the painting.  Hr'g at Min. 10:47–10:50.  The Podrets provided multiple before-and-after photos of each of the repainted rooms as evidence that the paint job was, as Jana Podret characterized it, "pretty awful."  Hr'g at Min.11:38; Podret Ex. P.  The Podrets' contractor,  Hanson, testified that there was "not one place that was painted that was professional," noting that there was paint on the trim-work, baseboards, and the edges of the ceiling, as well as in the carpets.  Hr'g at Min. 12:41–48.  Additionally, there were numerous places where the paint was uneven both in color and texture from overlapping painting and runs from drips.  *Id.*  From the photographs provided, the Court can see uneven paint lines along the edges, stray paint marks on the ceilings and trim, streaking, missed spots, and haphazard brush strokes.  Further, both Jana Podret and Hanson testified that multiple outlet covers and lightswitch plates were painted over, such that they could not be removed without damaging the sheetrock underneath.  Hr'g at Min. 11:38, 12:42; Podret Ex. E.  Hanson testified that, because the uneven paint job required him to sand portions flat and repaint to cover criss-crossing brush strokes, there was no cost-effective way to touch up the paint in any of the five rooms that the Debtor painted without repainting each room in full.  Hr'g at Min. 12:45–12:48.

The Podrets introduced as an exhibit the an invoice from "Heyer Hanson Inspections, LLC," that Hanson prepared (the "Hanson Invoice"), which details the damage to the House and breaks out the cost for the repairs he performed by room and category.  Podret Ex. E.  The Hanson Invoice was admitted into evidence without objection by the Debtor's counsel, and this Court will

consider it as evidence for the truth of what it represents as a business record prepared by Hanson in the regular course.  *See* FED. R. EVID. 803(6).  The Hanson Invoice reflects that he charged $450 per each room to repaint Bedroom 1 and Bedroom 2, noting that those rooms "required Kilz [primer] and 3 coats for coverage," and that he also repainted trim where the Debtor's paint had dripped.  Podret Ex. E. at 2.  Hanson also repainted the third upstairs bedroom ("<u>Bedroom 3</u>"), which the Debtor had painted top to bottom—including the ceiling—in a very dark purple color.  Podret Ex. P, at 12.  Due to the difficulty of covering the dark color and the ceiling work required, the Hanson Invoice priced the repaint of Bedroom 3 at $900.  Podret Ex. E, at 3.  Hanson charged $650 to repaint the dining room that the Debtor painted a dark teal color, and $375 to repaint the bathroom that the Debtor painted an orange-brown.  *Id.* at 1; Podret Ex. P, at 3 & 4.  Accordingly, the Court allows **$2,825** of the Podret Claim for the cost of repainting those rooms, finding this to be "the cost of restoration if the thing damaged can be adequately repaired."  *Cross Gates, Inc.*, 267 So. 3d at 1170.

The Podrets also provided evidence that the Debtor left paint stains throughout other parts of the House.  Jana Podret testified that the orange paint in the downstairs bathroom got on the sink and the toilet as well as the trim, Hr'g at Min. 11:32–11:33, and the Hanson Invoice reflects $240 for "removal of toilet and sink to remov[e] paint from both ($120.00 each) then replace," Podret Ex E, at 1; *see also* Podret Ex. P, at 3 (photographs of the bathroom paint job).  The Hanson Invoice also reflects $50 to remove the stain of paint washed down the sink in the upstairs bathroom, Podret Ex. E, at 3, a cost to which Sands stipulated, Hr'g at Min. 10:30.  Sands also admitted liability for the paint marks left running the length of driveway and onto the sidewalk, which Hanson testified he removed with great difficulty with a combination of bleach and pressure washing at the cost of $275.  Hr'g at Min. 12:42; Podret Ex. E, at 1; *see also* Podret Ex. P, at 2

(photographs of the driveway).  Finally, consistent with Hanson's testimony that he sanded and repainted the entry door where it was stained with paint, Hr's at Min. 12:44, the Hanson Invoice charged $500 to "refinish double front door due to purple paint," Podret Ex. E, at 2.  Accordingly, the Court allows an additional **$1,065** of the Podret Claim for the cost of restoring other parts of the House that were subject to miscellaneous paint damage.

### 2.  Other wall and door damage

In his testimony, Sands admitted liability for damage to one of the upstairs bedroom doors and nearby walls.  Hr'g at Min. 10:13.  According to the Hanson Invoice, the door to Bedroom 3 "had a hole in the door from the door stop going through it and a[n] indentation in the wall from the door knob."  Podret Ex. E, at 2.  The Court allows the **$185** of the Podret Claim that Hanson charged for the labor and supplies to replace this door.  *Id*; Podret Ex. D, at 16 (receipt for the door).

Sands denied responsibility for the smoke damage to the ceiling above the stove,  Hr'g at Min. 10:16, repaired by Mr. Hanson at a cost of **$320**.  Podret Ex. E.  The before-and-after pictures submitted as evidence by the Podrets, however, show the  substantial gray patch created by smoke and Sands did not refute Jana Podret's testimony that the damage was not there before they moved in but was there after they left.  Podret Ex. E, at 7; Hr'g at Min. 11:40.  Accordingly, the Court allows that portion of the Podret Claim as well.

The Podrets also allege that the Debtor caused damage to the "entertainment area and wet bar" that then needed to be repainted.  Podret Ex. E, at 1.  Sands denied that allegation as well, saying he and his wife did not bring any alcohol into the House or otherwise use the bar area for anything other than storing books.  Hr'g at Min. 10:19.  Unlike the smoke damage, there is no photographic evidence to show what this damage entailed or to create the presumption that it

occurred when the Debtor lived there.  Due to the lack of evidence before it, this Court denies the $205 sought to repair that unit.

The Podrets additionally seek to charge the Debtor for damage to the side entrance door, at the cost of $350 to repair the trim and repaint.  Podret Ex. E, at 1.  Sands did not deny that this damage occurred while his family lived there, but testified that Williams could have caused this damage when he replaced the refrigerator while the Sands Family lived in the House.  Hr'g at Min. 10:14.  Jana Podret, meanwhile, testified that, having grown up in the House, Hr'g at Min. 11:30, she knows that this large appliance would have had to have been brought in through the sliding double doors, not the smaller side entrance,  Hr'g at Min. 11:40–11:41.  Based on her credible testimony and the fact that the Debtor moved not just one appliance, but all of his furniture in and out of the House, the Court finds it more likely than not that the Debtor or his agents caused the damage rather than the Podrets, and allows **$350** of the Podret Claim for the ensuing repairs.

The remainder of the other asserted wall damage arises out of the Podrets' allegations, which the Debtor also denies, that the Debtor left an unusual number of very large holes in the walls throughout the House.  *E.g.*, Hr'g at Min. 11:35.  The Debtor does not dispute that they hung a set of partitions without prior approval, though he stated that Williams saw that these had been installed when he was in the House to bring the refrigerator and said nothing about them. Hr'g at Min. 10:19.  A lessor observing an alteration to the property after the fact and failing to object, however, does not constitute tacit approval.  *See Devall Town Corp. v. Branzaru*, 405 So. 2d 1185, 1186 (La. App. 1 Cir. 1981).  Though it is not readily apparent which line-items of the Hanson Invoice refer to the damage from the unapproved partitions, the Court infers that the charges for "repair trim dividing entryway and formal room" and then to "repair wall from holes" in that same room refer to these repairs.  Podret Ex. E, at 1.  The Court allows the associated cost of **$525**.

13

The more general references to the Sands Family leaving a large number of big holes throughout the House, however, are less substantiated. Jana Podret testified that there were larger holes where the Debtor hung "sconces or something," Hr'g at Min. 11:35, while the Debtor stated that they just "hung regular pictures," Hr. at Min. 10:18. The Court notes that the Hanson Invoice describes the "removal of *screws* from wall" in the living room for the cost of $200, Podret Ex. E., at 1 (emphasis added), seeming to belie the Debtor's representation that they only used typical picture-hanging hooks and nails. Still, the Court notes that none of the substantial number of photographs that the Podrets provided to the Court to illustrate the Debtor's damage shows noticeable holes in the walls. The one photograph in evidence that Jana Podret identified as an example of the many holes showed only one, solitary nail. Hr'g at Min. 11:51; Podret Ex. P, at 11. The Court is particularly cautious on this point because the charges in the Hanson Invoice apparently associated with this alleged damage are surprisingly high. The Hanson Invoice represents that Hanson in the living room "attempted to blend paint in just areas where the wall was repaired, however it failed to blend. This required that the entire room [] be painted." Podret Ex. E, at 2. Then follows a $1,200 charge to "paint entire living room." *Id.* Similarly, the Hanson Invoice includes for the side entryway "repair holes and refinish wall above window *and paint walls*," at the cost of $300, and for the upstairs bathroom "patch holes in walls and repaint," also for $300. Podret Ex E, at 1 & 3. The Court is unwilling to conclude that the damage from holes it has not been shown any examples of was so extensive as to require costly repaints in three different rooms. The Court will allow **$200** of the Podret Claim to repair the damage from the screws in the living room, and an additional **$200** to patch the remainder of the holes Jana Podret testified were left.

14

### *3. Upstairs floor damage—carpets and subfloor*

Before the Debtor moved in, he sought and received permission from the Podrets to install new carpet in the three upstairs bedrooms.  Hr'g at Min. 9:55–9:58.  Although originally the project would be entirely funded by the Debtor, the carpet company found that parts of the carpet in the closet in Bedroom 1 were torn up, making it more difficult and expensive to re-carpet that room.  *Id.*  Because of that, the Podrets agreed to cover the cost of re-carpeting Bedroom 1.  *Id.*  The Debtor testified that each room cost approximately $450–$500 to re-carpet.  Hr'g at Min. 10:23.

Jana Podret testified that when she and Williams entered the House on May 6, 2019 after the Sands Family moved out, the interior "reeked" of urine.  Hr'g at Min. 11:37; 11:49–11:50.  In Bedroom 1, where she testified the smell was particularly bad, she counted eighteen urine stains on the three-week old carpet.  *Id.*  She testified that the liquid had soaked through the carpet, the foam, padding, and the subfloor, all of which ultimately had to be replaced to eliminate the odor.  *Id.*  The Podrets provided several pictures where the multiple stains are visible on the underside of the carpet.  Podret Ex. P, at 5; Podret Ex. Q, at 29–30.  The Hanson Invoice similarly represented that the carpet in both Bedroom 1 and Bedroom 2 was stained with urine and that, "to properly get rid of the smell, all subflooring requires removal and replacement with plywood," at the cost of $580 per each of the two rooms to repair the subfloor.   Podret Ex. E, at 2.  Other than to note that the urine could have been from a pet rather than a person, the Debtor did not offer any argument or evidence to refute the urine damage.  Hr'g at Min. 11:49–11:50.  The Court allows **$1,160** of the Podret Claim to repair the damage to the subfloor.

As to the rest of the carpet, Jana Podret also testified that paint was tracked and dripped throughout the carpet in Bedroom 3 and across the landing and down the stairs, staining the carpet there. Hr'g at Min. 12:12, 12:18.  Though the Podrets did not provide pictures of the carpeting on

the landing and stairs, they did provide photographs showing where paint was dripped in the bedrooms themselves, Podret Ex. P, and Hanson testified that it was clear from the paint in the carpets that the floors were not properly covered while painting, Hr'g at Min. 12:42.  Based on the evidence of copious other paint drips and stains around of the House, the Court accepts Jana Podret's testimony that the Debtors' paint also damaged the carpeting on the landing and stairs beyond repair.

The Podrets obtained an estimate from Carpet World for $1,941.53 to replace all of the damaged upstairs carpet.[3]  As the Louisiana court noted in *Cross Gates, Inc. v. Rouses Enterprises, L.L.C.*, "where property is destroyed beyond repair and the market value is not ascertainable, the proper measure of damages is replacement cost less depreciation." 267 So. 3d at 1172 (citing *Cenac v. Duplantis Moving & Storage Co.*, 407 So. 2d 424, 426 (La. App. 1 Cir. 1981)).  Here, the Court has limited evidence to assess the degree of depreciation.  Technically, the carpet in the three bedrooms was essentially brand new.  But of those rooms, only Bedroom 1 was paid for by the Podrets.  The other two bedrooms as well as the landing and stairs would, but for the Debtor, still contain the older, unruined carpet—better than what the Podrets ended up with, but not as valuable as the new carpets that $1,941.53 would cover.  "Regardless of how the court arrives at the amount of the damage award, the intent of the law is to place plaintiff in the same position he was in prior to the accident—not in a better position." *Duplantis Moving & Storage Co.*, 407 So.

---

[3]      Jana Podret testified that they ultimately decided to install tile floor in the upstairs bedrooms instead, which was more expensive, but would be less prone to damage from future tenants.  Jana Podret correctly acknowledges that the Debtor is not responsible for the cost of the upgrade from carpet to tile, and therefore seeks damages equivalent to what it would have cost to install new carpet to replace what the Sands Family ruined, and does not seek compensation for the cost of the tiles or their installation.

2d at 427.  The damages award should approximate, as best as possible, the value of those carpets that the Podrets would otherwise have if not for the Sands' contributions, both good and bad.

Jana Podret testified that she did not know how old the prior carpet was, but that she believed it to be in good condition.  Hr'g at Min. 12:09–12:11.  Sands, to the contrary, testified that it was worn and stained, and that Williams told him that they would "consider replacing them after a year or so."  Hr'g at Min. 9:56; *see* FED. R. EVID. 801(d)(2)(A).  From the couple of photographs that the Court viewed of the old carpet, it is difficult to assess its condition other than to identify that it seems to have been recently steam-cleaned.  Podret Ex. P, at 10–11.  Based on the information before the Court indicating that the carpets were older, but still in good enough shape that the Podrets did not replace them when they performed others renovations shortly before the Debtor moved in, the Court estimates that the value of the old carpeting was roughly 50% that of the new carpeting included in the Carpet World estimate.  The Court allows $500 for the cost of replacing the ruined, new carpet in Bedroom 1, and half of the remainder of the estimate to replace the older carpets, for a total allowed amount of **$1,221**.  *See St. Tammany Inv. Properties, Inc. v. Cairns*, 425 So. 2d 252, 254 (La. App. 1 Cir. 1982) (affirming the lower court's award of $1,000 to a lessor based on its rough estimate of what portion of the property damages was attributable to the defendant lessee, noting the trier of fact's "considerable discretion in the assessment of damages").

### 4. Downstairs floor damage—concrete

As illustrated through testimony and photographs, the majority of the floors on the first level of the House are acid-etched concrete. Hr'g at Min. 10:08; Podret Ex. P. Jana Podret testified that those floors had just been refinished, and that "no one had lived on those floors" before the Sands Family moved in. Hr'g at Min.11:29. The Podrets provided before-and-after photographs

17

of the floor in the master bedroom and the entryway showing that, after the Sands Family moved out, there were a substantial number of new scratches in those freshly refinished concrete floors. Podret Ex. P, at 6, 8. On cross-examination of Jana Podret, Debtor's counsel inquired whether the entryway drag-marks could have been caused by Williams when he installed the new refrigerator. Hr'g at Min. 12:22–12:23. Jana Podret responded that the drag marks and scratches ran from the door to the laundry room, off to the left, rather than to the kitchen, which is off to the right, indicating that the marks were not caused by the installation of the refrigerator. Hr'g at Min. 12:23. Based on the testimony and the photographs, the Court finds that the Podrets carried their burden to demonstrate that the Debtor is responsible for the damage to the floors.

The Hanson Invoice calculated $1,500 for the labor to refinish the concrete flooring, with the following accompanying description: "[T]here was extensive scratching across all the concrete flooring and wood floors in entryway. I had to prep concrete flooring by scraping all paint drip marks by hand. Followed by mopping and stripping the floors. Lastly, I applied multiple coats of wax throughout the downstairs." Podret Ex. E, at 2. Per the Hanson Invoice and Jana Podret's testimony, the Podrets separately purchased the wax, mop, and putty knife to complete this job for a total of $132.57, as reflected in additional attached receipts from Xtreme Polishing Systems and Economical Janitorial and Paper Supplies, Inc. Podret Ex. E, at 3, 10–11. Accordingly, the Court allows **$1,632.57** of the Podret Claim to the restore the concrete floor.

### 5. Water damage from overflowed toilet

As discussed above, the Podrets arrived at the House on May 6, 2019, to find copious amounts of water seeping through the ceiling into the master suite from the upstairs bathroom. Jana Podret and Hanson both testified that the liquid appeared to be waste from an overflowed toilet and not just a water leak. Consistent with Hanson's testimony cited above, he wrote in the

Hanson Invoice: "The darker stain remaining indicated human waste was contained in the water rather that a leak. A leak would have resulted in a simple darker grey sheetrock. Additionally, I inspected the upstairs bathroom to rule out leaks originally from pipes or tub." Podret Ex. E, at 2. Photographs of the master suite that the Podrets offered as evidence show the damage spread across a substantial portion of the ceiling and partway down the wall. Podret Ex. P, at 10. Jana Podret testified that the Debtor never informed her or Williams of any problems with the toilet until 11:00 P.M. on May 6, 2019. Hr'g at Min. 12:28.

The Hanson Invoice includes a line-item for the water damage repair in the master suite for $1,475, including labor and supplies. Podret Ex. E. The Hanson Invoice also describes installing a new light fixture in the master because "water had collected in original fixture," at the cost of $150. Finally, in between those two charges is $300 to repaint the master bathroom. As Jana Podret and Hanson both asserted that this bathroom in the master suite was impacted by the water damage, the Court concludes that this repaint was likely necessitated following the repairs from the overflow. Accordingly, the Court allows **$1,925** in restoration costs to repair the water damage.

### 6. Window coverings

Jana Podret testified that some of the blinds in the upstairs bedrooms had to be replaced because they were, like so many other things, stained with the Debtor's paint. Hr'g at Min. 11:42. Meanwhile, at least some of the curtains in the master bedroom were, according to both Jana Podret's testimony and the photographs, left balled up and damaged on the floor, unable to be reused. Hr'g at Min. 11:42, 12:07; Podret Ex. P, at 8.

The evidence provided to show the cost to replace these window treatments, however, is somewhat unclear. It appears that the Podrets purchased and hung the new coverings themselves,

as the Hanson Invoice does not include that expense.  Podret Ex. E.  The Podrets instead provided

as an exhibit a print-out from an online shopping cart from "Lowe's Custom Blinds and Shades

Store."  Podret Ex. D, at 15.  This exhibit shows in the virtual cart two sets of aluminum blinds,

with a listed unit price of "$58.61, was $97.68 (Save 40%)," for a printed total of $117.22.  *Id.*

But someone has handwritten "bedrooms 1 & 2" and a different total of "195.36," which would

have been the price for the two blinds at the non-sale price of $97.68 apiece.  *Id.*  Listed below

those blinds are two of a different item at a unit price of "$193.62, was $322.70," with a printed

total of $387.24.  As with the aluminum blinds, someone has handwritten what would be the total

at the non-sale price—$645.40—and this time "bedrooms 1 & 3."  In addition to their inconsistent

representation of the prices, the Court is unclear why these notations indicate that the Podrets

purchased both the first and second kind of window coverings for Bedroom 1.  Additionally, the

page also cuts off without giving a name, description, or picture of this second type of item, leaving

the Court without any information to assess whether it was a reasonable replacement for the

damaged coverings.  Nor does Jana Podret's testimony specify how many of what types of new

window coverings they needed to purchase.

In light of this lack of clarification about what type of window coverings were purchased

for which rooms at what price, the Court cannot conclude that the Podrets are entitled to the

requested $922.73 for replacements.  The Court will allow **$117.22** of the Podret Claim for damage

to the window treatments, equal to the total listed price of the identifiable replacement items shown

in this exhibit.

### 7. *Supplies purchased from Lowe's*

The Hanson Invoice states that, in addition to the supplies Hanson included in calculating

the charges discussed above, the Podrets personally paid for $1,341.74 in supplies from Lowe's

Home Improvement.  Podret Ex. E, at 3.  Jana Podret similarly testified that they spent $1,341.23 at Lowe's on supplies to repair the Debtor's damage to the House.  Hr'g at Min. 11:57.  The Podrets provided photocopies of their Lowe's receipts as evidence of those expenses.  Added together, those receipts show $2,450.12 in purchases from May 27, 2019—July 21, 2019.  Podret Ex. D. The receipts also reflect, as Jana Podret testified, that they received a 15% discount across the board on these purchases because of Williams' military service.  Hr'g at Min. 11:57.  Those receipts, unfortunately, are difficult both to read and to decipher—the typical receipt shorthand gives the Court very little to work from in determining what all was purchased.  Nor did Jana Podret give much detail about those expenses in her testimony, describing the purchases generally as "supplies" purchased for repairs to the House.  *Id.*

This Court is mindful, however, that the claimants are pro se, and have been generally been diligent in documenting their costs that give rise to their claim.  The Podrets provided testimony, which was corroborated by the Hanson Invoice, that $1,341, just over half of these purchases, was used to repair the damage for which the Debtor was responsible.  Considering all of the evidence as a whole, including this Court's finding that Jana Podret was a credible witness, this Court finds it more likely than not that at least 50% of the Podrets' large purchases of supplies from a home improvement store in the summer of 2019 were used for the contemporaneous, extensive repairs of the damages the Debtor caused.    The Court accordingly allows the requested **$1,341.74** of the Podret Claim for supplies.

### 8. Closet Doors

Finally, the Podrets seek damages for the cost of rehanging the closet doors in the three upstairs bedrooms.  Podret Ex. E.  Sands affirmed in his testimony that they removed and stored these doors while they lived in the House.  Hr'g at Min. 10:13.  He testified that they intended to

return to the House after moving out to replace the doors and generally clean the House, but were unable to because the Podrets locked them out on May 7.  *Id.*  While that may be true, the Court determines that the Podrets' decision to change the locks when they did was reasonable considering the damage they encountered when they came to the House on May 6—particularly the seeped water from the overflowed toilet and the urine damage in the upstairs bedrooms. Accordingly, the Court allows **$241.51** of the Podret claim for the cost of changing the locks, Podret Ex. D, at 12, and will also hold the Debtor liable for the cost of rehanging the closet doors.

The photographs of the upstairs bedrooms show that each of the rooms had two closets with two doors each, for a total of twelve closet doors that had to be reattached.  Podret Ex. P, at 5 & 11.  The Hanson Invoice reflects a cost of $135 per set, for a total cost of **$810**, which portion of the Podret Claim the Court hereby also allows.  Podret Ex. E.

### B. Abandonment of the Property and Lost Rental Income

In addition to reimbursement for damages to the House, the Podrets seek compensation for four months of lost rent while the House was unoccupied, and for the associated costs to re-rent to new tenants.  Under article 2683 of the Louisiana Civil Code, "the lessee is bound: (1) To pay the rent in accordance with the agreed terms."  The Lease itself includes more detailed provisions, establishing that "should premises be abandoned by Lessee . . . Lessee shall be in default and the rental of the whole of the unexpired term of this lease, together with any attorney's fees, and all other expenses shall immediately become due."  Podret Ex. A, at 2.  In the event the Lessor cancels the lease and retakes possession following such default, "Lessee is obligated to pay any and all rent and expenses due and owed *through the day said premises are re-rented or this lease expires, whichever is sooner*."  *Id.* (emphasis added).

Here, the Debtor moved out at the start of May 2019, before paying rent for that month. The Podrets were able to complete repairs by the end of July, then put the House back on the rental market in August to find new tenants who began their lease in September. Because the House was re-rented before the Lease expired, the Podrets seek unpaid rent from May through August, at $2,100 a month, for a total amount of **$8,400**, instead of the entire amount of accelerated rent for the duration of the Lease. The Debtor admitted liability for this unpaid rent, Hr' at Min. 10:25, and the Court allows that portion of the Podret Claim.

Jana Podret additionally testified that, to re-rent the property, they paid their leasing agent $1,260, calculated as 60% of one month's rent. Hr'g at Min. 12:02. The Lease affirms that fee for the leasing agent, Podret Ex. A, and the Debtor admits liability for that charge, Hr'g at Min. 10:21. Additionally, the Podrets seek $200 for the cost of maintaining the lawn the summer, which the Debtor also agrees to pay. Hr'g at Min. 10:21, 12:02. The Court allows **$1,460** of the Podret Claim for those expenses that were incurred as a result of the Debtor's abandonment of the property and early termination of the Lease.

Finally, the Lease states: "Lessee further agrees that if an Attorney is employed to protect the rights of the Lessor hereunder, Lessee will pay the fee of such attorney," with the limitation that the fee shall not exceed 25% of damages sought. As noted, the Podrets have acted pro se throughout most of this dispute. But Jana Podret testified that they originally sought the assistance of an attorney to develop their claims against Sands, and provided a receipt for the $1,000 retainer they paid to a law firm on May 15, 2019. Hr'g at Min. 12:03, Podret Ex. L. Accordingly, the Court allows **$1,000** of the Podret Claim for those attorney's fees under the terms of the Lease.

### C.  Security Deposit

At the start of the Lease, the Debtor paid a security deposition of $2,100 and an additional $250 pet deposit.  Per the letter the Podrets sent the debtor on May 28, 2019, that deposit was not returned.  Debtor Ex. 1.  Under Louisiana law, "[a]ny refundable security deposit held by the lessor may be retained and shall be credited against the lessee's liability for liquidated damages and other amounts owed the lessor."  LA. STAT. ANN. § 9:3325.  Accordingly, the Court **credits the Debtor for the $2,350** of their unrefunded deposit against the damages calculated herein.

### CONCLUSION

For the foregoing reasons and as itemized herein,

IT IS ORDERED that Proof of Claim 3 against the Debtor, Lee Sands, is ALLOWED as an unsecured claim in the amount of **$22,629.04;**

IT IS FURTHER ORDERED that the Creditor is instructed to amend Proof of Claim 3 within sixty (60) days of the date of this Order to reflect this amount and to list the creditor as Jana Podret in her personal capacity.

New Orleans, Louisiana, February 21, 2021.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE